**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF CONOR VINCENT D'MONTE | CASE. NO. 22-mj-230 (MDM) |

## ORDER ON EXTRADITION AND CERTIFICATE OF EXTRADITABILITY

Pending before the Court is the Government of the United States' request, on behalf of the Government of Canada, to certify to the Secretary of State that Conor Vincent D'Monte ("D'Monte" or "the fugitive") is extraditable to Canada to face criminal prosecution in that country. Having held an extradition hearing on January 27, 2023, and after a careful consideration of the evidence submitted by the parties, in pertinent part, the certified and authenticated documents submitted by the Government of Canada, as well as the arguments of counsel, the Court hereby **GRANTS** the request and **ORDERS** the extradition to proceed.

### I.    Preliminary Matters and Procedural Background.

D'Monte has been charged in Canada with conspiracy to commit murder in violation of § 465(1)(a) of the Criminal Code of Canada, and first-degree murder in violation of § 235 of the Criminal Code of Canada. The Government of Canada has jurisdiction over the criminal conduct alleged.

On May 28, 2021, the U.S. District Court for the District of Columbia issued a provisional arrest warrant for D'Monte pursuant to a criminal complaint ("D.C. Criminal Complaint"). Almost a year later, on February 25, 2022, D'Monte was arrested in the District of Puerto Rico pursuant to that arrest warrant. On March 1, 2022, the U.S. District Court for the District of Puerto Rico issued a provisional arrest warrant for D'Monte pursuant to another criminal complaint (the "Puerto Rico Complaint") based on the same set of facts alleged in the D.C. Criminal Complaint. On March 3, 2022, D'Monte appeared before the undersigned for an initial appearance and was ordered temporarily detained pending further proceedings.

On April 22, 2022, the Government of Canada made a formal request to the United States, via the diplomatic channel, for the extradition of D'Monte, pursuant to the provisions of the Treaty on Extradition Between the United States of America and Canada signed at Washington on December 3, 1971, as amended by Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. TREATY DOC. NO. 101-17 (1990), and Second Protocol Amending the Extradition Treaty with Canada, U.S.—Can., Jan. 12, 2001, S. TREATY DOC. NO. 107-11 (2002) (Docket No. 39-1) (hereinafter the "Treaty").

On November 9, 2022, the government filed a motion entitled "Memorandum of Extradition Law" ("Motion for Extradition"). (Docket No. 58). In its Motion for Extradition, the government formally requested that the Court certify to the Secretary of State that D'Monte is extraditable to Canada on each of the offenses for which his extradition is requested. *Id.* On December 12, 2022, D'Monte filed an opposition to the Motion for Extradition, raising several challenges to his extraditability back to Canada, and renewed his request to compel discovery ("Opposition to Motion for Extradition"). (Docket No. 60).[1] D'Monte acknowledged that "[he] and the government agree, for the most part, about the general requirements to certify extradition." *Id.* at 1. Notwithstanding, D'Monte then used the bulk of his Opposition to the Motion for Extradition to attempt to re-litigate matters which had already been litigated in this case and decided against him. (*See* Docket No. 54). In addition, D'Monte argued that the Puerto Rico Rules of Criminal Procedure, rather than federal extradition law, apply in this case.

On January 4, 2023, the government then filed a Reply to D'Monte's Opposition to the Motion for Extradition.

---

[1] Previously, on May 13, 2022, D'Monte filed a "Motion for Discovery and Compliance with *Brady* Obligations; Motion to Stay Briefing to Permit Disclosure" (the "Motion for Discovery"). (Docket No. 38). *Brady v. Maryland*, 373 U.S. 83 (1963). In his Motion for Discovery, D'Monte requested that the Court order the United States government to provide him with "limited discovery" as part of his extradition proceeding" and to produce all *Brady* material in its possession. *Id.* at 12. On October 17, 2022, the Court issued an opinion and order denying D'Monte's Motion for Discovery. (Docket No. 54). The Court found D'Monte's arguments to be unavailing and contrary to basic principles of extradition law.

By statute, the judicial officer handling the extradition proceedings is required to hold a hearing to consider the evidence of criminality presented by the government of Canada and to determine if it is "sufficient to sustain the charge under the provisions of the proper treaty of convention." 18 U.S.C. § 3184.

Accordingly, on January 27, 2023, this Court held an extradition hearing. During the hearing, the government admitted into evidence two composite exhibits. Composite Exhibit 1 included the following documents: a) a Certificate from the Honorable David L. Cohen, United States Ambassador to Canada, certifying the authenticity of the documentary evidence submitted in support of the request for extradition, as required by Title 18, *United States Code*, Section 3190 (Docket No. 71-1 at Bates No. 44); and b) a Certificate of Authentication signed by Cathy Chalifour, Senior Counsel, International Assistance Group, Department of Justice of Canada, to which was appended i) an Affidavit of Law, signed by Karima Andani, Crown Counsel, BC Prosecution Service (Docket No. 71-1 at Bates Nos. 45-55), providing, inter alia, a true certified copy of the Indictment filed in the Supreme Court of British Columbia against D'Monte, dated January 24, 2011 (Docket No. 71-1 at Bates Nos. 56-58), and a true certified copy of the Warrant for Arrest for D'Monte issued by Associate Chief Justice A. W. MacKenzie of the Supreme Court of British Columbia (Docket No. 71-1 at Bates No. 59), and ii) an Affidavit of Fact, signed by Detective Terrence Murphy, of the Organized Crime Agency of British Columbia, Combined Forces Special Enforcement Unit, containing a summary of the facts of the case supporting probable cause, as well as several photos of Conor Vincent D'Monte, including what appears to be a booking photo and photos from his now expired passports from Canada and Ireland. (Docket No. 71-1 at Bates Nos. 60-77).

Composite Exhibit 2 included a Declaration of Tom Heinemann, Attorney Advisor, Office of Legal Advisor, United States Department of State, containing a description and explanation of the treaty between the United States and Canada and a copy of the relevant provisions of the treaty. (Docket No. 71-1 at Bates Nos. 1-43).

On his part, D'Monte did not introduce any exhibits during the extradition hearing, however, his counsel did reiterate D'Monte's "reject[ion] of the facts and the charges included in the extradition package" (Docket No. 70 at 33 of 39) and asked the Court to take note of the legal arguments raised previously in his Motion for Discovery (Docket No. 38), which was denied by the Court in Docket No. 54, and in his Opposition to Motion for Extradition (Docket No. 60).

## II.    <u>**Extradition: In General.**</u>

Extradition is a means by which a fugitive (also referred to as a "relator" for purposes of extradition proceedings) is returned to a foreign country, typically pursuant to a treaty, to face criminal charges or to serve a sentence of imprisonment. Extradition is primarily an executive function with a limited role for the judiciary under the extradition statute (referred to generally as "Chapter 209"). *See* 18 U.S.C. § 3184; *see also In re Extradition of Hilton*, No. 13-7043, 2013 WL 1891327, at *3 (D. Mass. May 3, 2013) ("Extradition is an executive, not judicial, function.") (citing *Martin v. Warden*, 993 F.2d 824, 828 (11th Cir. 1993)). As a result, it has long been settled that an extradition is not a criminal proceeding, *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980), but rather is "essentially administrative in character," Fed. R. Evid. 1101(d)(3), Notes of Advisory Committee on [1972] Proposed Rules, Note to Subdivision (d) (West 1984).

The Secretary of State, and not the court, makes the ultimate decision whether to surrender a fugitive to the requesting country. 18 U.S.C. §§ 3184, 3186; *Hilton v. Kerry*, 754 F.3d 79, 84 (1st Cir. 2014). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competency of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

Upon a complaint from the Department of Justice in response to the foreign government's request, the magistrate judge issues a warrant for the arrest of the individual sought. *See id.* § 3184; *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1050 (1st Cir. 2021). The magistrate judge then conducts a hearing to consider whether the extradition request complies with the relevant treaty's documentation requirements, and whether "the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty." *See id.* An extradition hearing is not a criminal proceeding. Its purpose is to decide the sufficiency of the charges under the treaty, not to determine the fugitive's guilt or innocence; that is for the foreign court. *See e.g., Collins v. Loisel*, 259 U.S. 309, 316 (2022); *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *Benson v. McMahon*, 127 U.S. 457, 463 (1888). At the extradition hearing, therefore, the Court's role is limited to the consideration of the evidence presented on behalf of the requesting country and the determination of whether the legal requirements for certification—as the treaty, statutes, and case law define them—are present. *Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)); *Kin-Hong*, 110 F.3d at 109.

Consistent with the above principles, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules– except for those on privilege–do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *Balzan v. United States*, 702 F.3d 220, 224 (5th Cir. 2012). Moreover, the fugitive has no right to discovery. *See e.g., Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005), cert. denied, 546 U.S. 1171 (2006); *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984).

If the Court finds that the requirements for certification are satisfied, the Court must furnish the certification to the Secretary of State, together with a copy of any testimony taken before the Court and must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding

surrender. 18 U.S.C. §§ 3184, 3186; *Hilton*, 754 F.3d at 84. The Secretary then "determine[s] whether or not the [fugitive] should actually be extradited." *Kin-Hong*, 110 F.3d at 109 (citing 18 U.S.C. § 3186). In making extradition determinations, "[t]he Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review." *Sidali v. INS*, 107 F.3d 191, 195 n.7 (3d Cir. 1997).

Magistrate judges' certifications of extraditability are not appealable final orders under 28 U.S.C. § 1291. *In re Mackin*, 668 F.2d 122, 127–28 (2d Cir. 1981). Extraditees therefore sometimes seek habeas relief to challenge their detention pursuant to the certifications. *See id.* at 128; *see e.g., In re Extradition of Manzi*, 888 F.2d 204, 205 (1st Cir. 1989) (per curiam).

The Court will now address what evidence may be considered in this matter and whether the elements for extradition are met in this case.

### III.  Discussion

####   A.   Evidence that may be considered by the Court for purposes of an extradition proceeding.

Title 18, *United States Code*, Section 3184, along with the Treaty, governs the nature and proper certification of documents in this case. Articles 9(2) and 9(3) of the Treaty list the documents the Government of Canada is required to submit when making a request for the extradition of a fugitive charged with a crime. Article 10(2) of the Treaty provides that "[t]he documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when, in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada . . . " *see also* 18 U.S.C. § 3190 ("Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of

such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.")

Here, the documents which the Government of Canada has submitted satisfy the applicable admissibility requirements, as Tom Heinemann, Attorney Adviser for the U.S. Department of State, attests in the declaration submitted. ("Heinemann Declaration," (Docket No. 71-1 at Bates Nos. 1-43)).

## B.   D'Monte's arguments in favor of applying all due process rights of a criminal defendant in an ordinary criminal proceeding to his extradition.

In his Opposition to the Motion for Extradition, D'Monte broadly claims that due process rights unequivocally apply in extradition proceedings and, as such, he is entitled to all the due process rights and protections afforded to a criminal defendant under United States and Puerto Rico law. His argument misses the mark for various reasons outlined in more detail below but in short, they fail because, to quote the Honorable Gustavo A. Gelpí, "it is well-settled in New Hampshire granite" that the scope of due process in international extradition proceedings is significantly limited. The Court thus rejects D'Monte's attempt to claim more due process rights than what the law and basic extradition principles provide.

At the outset, a fugitive's due process rights, unlike those of a criminal defendant, *are limited*, in accordance with the unique nature of an extradition proceeding. In other words, while a fugitive has certain due process rights in an extradition proceeding, those rights are *highly circumscribed*, as extradition proceedings do *not* involve a determination of guilt or innocence. *See e.g. Neely v. Henkel*, 180 U.S. 109, 122 (1901); *Jhirad v. Ferradina*, 526 F.3d 478, 482 (2nd Cir. 1976); *Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969); *Atuar v. United States*, 156 F. App'x 555, 562 (4th Cir. 2005). The full panoply of due process rights available to criminal defendants is *not available* to fugitives because an extradition proceeding

culminates in a surrender to the foreign government, rather than in criminal punishment of any sort. *See Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 829 (11th Cir. 1993) ("Constitutional procedural protections which by their terms are applicable *only* in criminal cases, however, are *unavailable* in extradition proceedings."). As a result, the Supreme Court has concluded that there is no "right to introduce any evidence which would be admissible upon a trial under an issue of not guilty." *Charlton v. Kelly*, 229 U.S. 447, 458 (1913) (rejecting fugitive's argument that such a right is available under federal law.).

Significantly, moreover, the federal extradition statute, 18 U.S.C. § 3184, sets forth the process to which a fugitive facing potential extradition is entitled. Specifically, that process includes notice in the form of a "complaint made under oath, charging [him or her] . . . with having committed [foreign crimes covered by the applicable treaty]," as well as a hearing at which "evidence of criminality may be heard and considered" to determine whether such evidence is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980) (stating that *"[t]hese statutory provisions [set forth in 18 U.S.C. § 3184] safeguard the fugitive's due process rights"*); *In re Extradition of McMullen*, 989 F.2d 603, 612 (1993) ("Before [a] determination [regarding surrender] is made, *[a fugitive] is entitled to the due process protections of an extradition proceeding*, including notice in the form of a 'complaint . . .' as well as a hearing at which 'evidence of criminality may be heard and considered.'") (quoting 18 U.S.C. § 3184). *See also United States v. Kin-Hong*, 110 F.3d 103, 120 (1st Cir. 1997) (finding that "there is no serious due process issue here" because fugitive's liberty interests are protected by the very existence of "an unbiased hearing before an independent judiciary") (internal quotation marks and citations omitted).

Furthermore, in general, during extradition proceedings, "[d]ue process is *not* violated 'so long as the United States has not breached a specific promise to an accused regarding his or her extradition, and bases its extradition decisions on diplomatic considerations without regard to such constitutionally impermissible

factors as race, color, sex, national origin, religion, or political beliefs, and in accordance with such other exceptional constitutional limitations as may exist because of particularly atrocious procedures or punishments employed by the foreign jurisdiction.'" *In re Extradition of Martinelli Berrocal*, No. 17-22197, 2017 WL 3776953, at \*27 (S.D. Fla. Aug. 31, 2017) (quoting *In re Extradition of Burt*, 737 F.2d 1477, 1487 (7th Cir. 1984) (internal citations omitted)).

In the present case, it is undisputed that D'Monte's arrest for purposes of extradition was obtained by way of a lawful criminal complaint. It is also undisputed that the required extradition hearing was held before a magistrate, as required under 18 U.S.C. § 3184. D'Monte has therefore received all the due process to which the law entitles him. Nothing more. Nothing less. And the case law on this matter is clear. *See Hilton v. Kerry*, 754 F.3d 79, 87 (1st Cir. 2014) ("No case law suggests that courts have the authority to go beyond the limited statutorily prescribed inquiry [to consider a due process claim] when the extradition itself is the only action challenged.") (internal quotation marks and citation omitted). In fact, courts repeatedly have *declined* to expand the scope of due process that applies in international extradition proceedings. *See e.g., Matter of Extradition of Manzi*, 888 F.2d 204, 206 (1st Cir. 1989) (finding that fugitive's claims did not raise due process claims warranting review); *Romeo v. Roache*, 820 F.2d 540, 543-44 (1st Cir. 1987) (rejecting fugitive's argument that "elemental due process is violated when a person lacking the capacity . . . to participate effectively in [an extradition proceeding] is certified as extraditable"); *López-Smith v. Hood*, 121 F.3d 1322, 1324 (9th Cir. 1997) ("Criminal trial of an incompetent defendant violates his constitutional right to due process of law. This principle, though, does not apply to [the fugitive], because if extradited he will not be subject to a criminal trial in the United States. His trial will be in Mexico. That sovereign nation has its own constitution and is not bound by ours.") (citations omitted); *In re Extradition of Burt*, 737 F.2d at 1482–87 (rejecting claims that considerable delay in extradition violated due process).

While the above is dispositive of D'Monte's arguments with respect to alleged violations of his due process rights during this extradition proceedings, the Court nevertheless touches upon D'Monte's other major arguments related to this matter, all of which similarly fail.

The Court also rejects D'Monte's assertion that Article 8 of the Treaty somehow entitles him to all remedies and recourses provided by the law of the requested state. Article 8 of the Treaty states that "[t]he determination that extradition should or should not be granted shall be made in accordance with the law of the requested state and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law." Treaty Art. 8. Courts have nevertheless consistently ruled that this provision, and similar provisions in other international treaties, *does not import substantive constitutional or statutory protections into the extradition context. See United States v. Williams*, 611 F.2d 914, 914 (1st Cir. 1979) (reversing district court's finding that a criminal defendant's right to be free on bail is a "remedy and recourse" available to a fugitive in international extradition proceedings); *Murphy v. United States*, 199 F.3d 599, 602 (2d Cir. 1999) (holding that Article 8 of the Treaty does not make violation of domestic statutes of limitation a ground for denying an extradition request); *Martin*, 993 F.2d at 829 (holding that Article 8 of the Treaty does *not* make the constitutional guarantees of due process and a speedy trial grounds for preventing extradition) (citing *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978)); *In re Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986) (same holding with respect to substantially identical clause in extradition treaty with Argentina).

Additionally, the Supreme Court has instructed courts to construe extradition treaties *liberally in favor of extradition* and this Court declines D'Monte's invitation to do otherwise. *See Factor v. Laubenheimer*, 290 U.S. 276 (1933).

> In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the

diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred. Unless these principles, consistently recognized and applied by this Court, are now to be discarded, their application here leads inescapably to the conclusion that the treaties, presently involved, on their face require the extradition of the petitioner . . . . 290 U.S. at 293–94 (emphasis added and internal citations omitted). As the First Circuit has explained, in the context of interpreting an international extradition treaty, "that construction should be adopted that enlarges the rights of the parties under the treaty," not the rights of the fugitive. *Brauch v. Raiche*, 618 F.2d 843, 850 (1st Cir. 1980); *see Kin-Hong*, 110 F.3d at 110 ("These principles of construction require courts to: interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories" (quoting *In re Extradition of Howard*, 996 F.2d 1320, 1330 (1st Cir. 1993) (emphasis added))).

In the context of interpreting an international extradition treaty, therefore, "that construction should be adopted that enlarges the rights of the parties under the treaty," *not the rights of the fugitive. Brauch v. Raiche*, 618 F.2d 843, 850 (1st Cir. 1980). Accordingly, D'Monte's argument that Article 8 of the Treaty somehow incorporates all the due process rights that United States law affords to a criminal defendant facing a United States criminal trial does not pass legal muster and must be rejected.

D'Monte also argues that the Puerto Rico Rules of Criminal Procedure apply in federal extradition proceedings. More specifically, D'Monte claims that he is entitled to a hearing that comports with Rule 23 of the Puerto Rico Rules of Criminal Procedure. D'Monte further claims that Article 10(1) of the Treaty incorporates Puerto Rico law concerning probable cause and all the procedural rules that govern a preliminary hearing in a Puerto Rico criminal case. For his position, he relies

heavily on *Romeo v. Roache*, 820 F.2d 540, 543-44 (1st Cir. 1987). D'Monte's argument misses the mark.

First, Article 10(1) of the Treaty provides that "[e]xtradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory . . . ." Treaty Art. 10(1). Such provision is "standard in American extradition treaties, and, as the language suggests," requires "a showing of probable cause to believe that the person whose extradition is sought from the United States has committed the specified crime." *In re Extradition of Stevenson*, No. 93CRMISC 1 P.44 (MHD), 1994 WL 164053, at *3 (S.D.N.Y. Apr. 21, 1994) (citations omitted) (interpreting Article 10 of the Treaty). As will be further discussed below, the Court's probable cause determination in this case strictly complies with the applicable standard.

Second, D'Monte's reliance on *Roache* is inapposite and the case does not support D'Monte's arguments. In *Roache,* the fugitive challenged the probable cause requirement for extradition, arguing that insufficient competent evidence was introduced at the extradition hearing to establish probable cause that the fugitive committed the murder alleged. As the government observes, D'Monte ignores that in *Roache*, notwithstanding that the court applied the state law formulation of probable cause—because *both* parties agreed that such formulation applied—the First Circuit, citing to the "limited function" of extradition proceedings, rejected the fugitive's assertion that due process *required* a competency hearing. *Id*. at 544. The Court of Appeals in fact held that due process did *not* require a hearing to determine the competency of the petitioner in the extradition proceeding.

In *Roache*, furthermore, the fugitive argued on appeal that under Massachusetts law, a defendant at a probable cause extradition hearing has the right to cross-examine the prosecution's witnesses and to present an affirmative defense. The fugitive's requests were not granted by the district court as they contradicted extradition law. The fugitive thus alleged on appeal that the standard of probable

cause was not met because the evidence presented in favor of extradition was by affidavit and he could not cross-examine the affiants and the government presented no evidence on sanity, evidence petitioner contended would be needed under the Massachusetts directed verdict standard. *Roache*, 820 F.2d at 545. The Court of Appeals rejected the fugitive's arguments.

In rejecting the fugitive's contentions, the First Circuit noted that the district court pointed out that under Massachusetts law, sanity is not an element of a crime, but rather is a defense, and the prosecution *need not* prove sanity beyond a reasonable doubt before the issue is raised. *Commonwealth v. Kostka,* 370 Mass. 516, 532–547, 350 N.E.2d 444, 455–458 (1976). *See Charlton v. Kelly,* 229 U.S. 447, 462, (1913) (indicating in an extradition proceeding that where insanity is a defense under the law of the extraditing state, evidence of insanity at the time of the commission of the offense is a matter for the jurisdiction seeking extradition, *not the extraditing court*). *Roache*, 820 F.2d 540, 545 (1st Cir. 1987). Likewise, the First Circuit declined to apply the "exclusionary rule," *Roache,* 820 F.2d at 545 (citing *Simmons*, 627 F.2d 635), and rejected the fugitive's challenge to hearsay evidence and his claim of entitlement to cross-examine witnesses. *id.* (citing *Shapiro v. Ferrandina*, 478 F.2d 894, 901–902 (2d Cir. 1973), cert. dismissed, 414 U.S. 884 (1973)).

Accordingly, contrary to D'Monte's suggestion, applying a state law standard for probable cause would not alter the inherently limited scope of an extradition proceeding in federal court. As the district court in *Romeo v. Roche* noted, applying Massachusetts law to determine probable cause did *not* require conducting the extradition proceedings "in all respects like a preliminary hearing in Massachusetts courts." *Romeo*, No. CIV.A. 87-1148-Z, 1987 WL 12547, at *1 (D. Mass. May 29, 1987). Rather, the magistrate judge "was entitled to rely on any evidence properly before him at an extradition hearing, even if that evidence would not have been admissible at a preliminary hearing under Massachusetts law." *Id.* (citing *Elias v. Ramírez*, 215 U.S. 398, 409 (1910)). The Court of Appeals affirmed all of those determinations.

The same holds true for this case. And even if the Court were to apply the definition of probable cause under Puerto Rico law that would neither necessitate nor require the Court to conduct the extradition hearing in all respects like a preliminary hearing in Puerto Rico courts nor would it require enlarging D'Monte's rights to those that would be afforded to a criminal defendant either under Puerto Rico or United States law.

The Court now turns to the crux of the matter at hand, whether the general requirements for extradition are met in this case.

### C.     Requirements to certify D'Monte's extradition.

In the present case, D'Monte himself recognizes that "[he] and the government agree, for the most part, about the general requirements to certify extradition." (Docket No. 60). A court *must* certify a fugitive as extraditable where: (1) the judicial officer is authorized to conduct the extradition proceedings; (2) the court has jurisdiction over the fugitive and the person whose extradition is sought is the same person named in the extradition request; (3) an extradition treaty exists between the United States Government and the country seeking extradition; (4) the treaty covers the offenses for which extradition is requested; and (5) there is sufficient evidence to support a finding of probable cause as to each offense for which extradition is sought. *See e.g., Matter of Extradition of Taylor*, 484 F. Supp. 3d 13, 15 (D. Mass. 2020) (citing *Fernández*, 268 U.S. at 312); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 344022, at *5 (S.D. Fla. May 28, 2015); *Santos v. Thomas*, 830 F.3d 991 (9th Cir. 2016) (en banc); *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008); *Quinn v. Robinson*, 783 F.2d 776, 783, 790 (9th Cir. 1986). *See also Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981) (citing 18 U.S.C. §§ 3181–3195), cert. denied, 454 U.S. 894 (1981); *United States v. Barr*, 619 F. Supp. 1068, 1070 (E.D. Pa. 1985) (probable cause to believe that the extraditee committed the crimes pending in Canada and listed in the applicable treaty); *Matter of Greer*, No. Misc. 91-90, 1991 WL 311924, at *1–2 (D. Vt. Nov. 20, 1991).

A magistrate judge "has no discretionary decision to make." *See Prasoprat*, 421 F.3d at 1012. If the elements of extradition are present, the magistrate judge *must* certify extradition. *Id. See also United States v. Perilla Umbarila*, 562 F. Supp. 3d 729, 734–35 (C.D. Cal. 2022).

Each of the requirements to certify extradition are met here. The Court explains.

## 1.    *This Court has authority over the extradition proceeding.*

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized to do so by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. It is also well-settled that both magistrate judges and district judges may render a certification under § 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993), cert. denied, 510 U.S. 1165 (1994). Furthermore, Local Rule 159(b)(10) of the Local Rules of the United States District Court for the District of Puerto Rico indicates that: "United States Magistrate Judges are also authorized to . . . conduct extradition proceedings pursuant to 18 U.S.C. § 3184."[2]

Based on the foregoing, the Court is authorized to conduct this extradition proceeding pursuant to 18 U.S.C. § 3184.

## 2.    *This Court has jurisdiction over D'Monte.*

The Court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue [its] warrant for the apprehension of the person so charged."). *See also Pettit v. Walshe*, 194 U.S. 205, 219 (1904); *In re Pazienza*, 619 F. Supp. 611, 616 (S.D.N.Y. 1985).

Here, D'Monte was arrested in the District of Puerto Rico on February 25, 2022, thus the Court has personal jurisdiction over him.

---

[2] The judicial officer conducting the hearing that Section 3184 prescribes does not exercise "any part of the judicial power of the United States" but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted).

3.      *The Treaty.*

Section 3184 provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States. Extradition treaties create an obligation for the United States to surrender fugitives under particular circumstances. It is well settled that extradition treaties are to be liberally viewed to accomplish the desired purpose, which is the surrender of fugitives to be tried for extraditable offenses. *Factor v. Laugenheimer,* 290 U.S. 276, 293 (1933). A treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Id.* at 298. "The point of an extradition treaty after all is to *facilitate extradition* . . . ." *Martínez v. United States*, 828 F.3d 451, 463 (6th Cir.) (en banc), cert. denied, 137 S. Ct. 243 (2016).

D'Monte does not contest that an extradition treaty exists between the United States and Canada which was in effect at the time that the crimes charged took place. Such treaty is the Treaty on Extradition Between the United States of America and Canada, which is dated December 3, 1971, 27 U.S.T., T.I.A.S. 8237, as amended by Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. TREATY DOC. NO. 101-17 (1990), and Second Protocol Amending the Extradition Treaty with Canada, U.S.—Can., Jan. 12, 2001, S. TREATY DOC. NO. 107-11 (2002) (Docket No. 39-1). In pertinent part, under Article 10 of the Treaty, a court may order extradition only if the evidence is found to be sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting state. *Id.*

In addition to the above, Tom Heinemann, Attorney Advisor in the Office of Legal Advisor for the United States Department of State, has provided a declaration attesting that the Treaty was (and is) in full force and effect at the time of the crimes charged. Heinemann's declaration also contains a description and explanation of the Treaty and a copy of the relevant provisions of the Treaty. (Docket No. 71-1 at Bates

Nos. 1-43). It is well-settled that the State Department's determination in these matters is entitled to deference from the Court. *See Charlton*, 229 U.S. at 468; *Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Kastnerova v. United States*, 365 F.3d 980, 985-87 (11th Cir. 2004), cert. denied, 541 U.S. 1090 (2004); *Then v. Meléndez*, 92 F.3d 851, 854 (9th Cir. 1996).

Based on the foregoing, the Court finds that at the time of the crimes charged, a treaty existed between the United States and Canada, which was in full force and effect.

### 4.   *Crimes Charged.*

Article 1 of the Treaty provides that persons charged with any of the offenses listed in Article 2 of the Treaty shall be subject to extradition. Further, the Treaty provides that "Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment." Art. 2(1). Pursuant to Article 2(1), the Treaty encompasses the offenses for which D'Monte has been charged and for which his extradition is sought in this case.

In determining whether an offense is punishable under the laws of both countries, extradition courts properly look to the underlying acts to determine whether, if they had been committed in the United States, would violate United States federal law, the law of the state in which the hearing is held, or the law of the preponderance of the states. *See Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981); *Matter of Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989).

The Canadian offenses need not be identical to ours. In *Collins v. Loisel*, the Supreme Court held that dual criminality exists "if the particular act charged is criminal in both jurisdictions," even if the name of the offense or the scope of the liability differs in the two countries. 259 U.S. 309, 312 (1922); *see United States v. Riviere*, 924 F.2d 1289, 1302 (3d Cir. 1991) ("[T]he rule of double criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours.").

In this case, dual criminality exists. The Government of Canada submitted documents that were properly authenticated and certified in accordance with 18 U.S.C. § 3190 and Article 10 of the Treaty. Those documents include pertinent text for the crimes with which D'Monte has been charged. The Government of Canada has also provided the affidavit of prosecutor Karima Andani, which explains each of the relevant Canadian laws as applicable to D'Monte's criminal conduct. Additionally, D'Monte's conduct underlying the alleged Canadian crimes, had he committed the conduct in the United States, would be subject to prosecution under United States and Puerto Rico laws, including 18 U.S.C. § 1111 (murder, which carries a potential sentence of life imprisonment); 18 U.S.C. § 1117 (conspiracy to murder, which carries a potential sentence of life imprisonment); 18 U.S.C. § 1958 (murder for hire and/or conspiracy to murder for hire, which if death results, carry a potential sentence of life imprisonment); Puerto Rico Penal Code 2012, Chapter 330, Subchapter 1, Murders & Homicide §§ 5141, 5142, 5143 (first degree murder, punishable for a fixed term of 99 years); and/or Puerto Rico Penal Code 2012, Chapter 339, Subchapter 7, Crimes Against Public Order, § 5334 (conspiracy involving a felony punishable by three years).

Accordingly, the Court finds that the Treaty covers the offenses for which the Government of Canada seeks to extradite D'Monte.

### D.   The person whose extradition is sought is the same person named in the extradition request.

The individual arrested in this case has not specifically contested identity; namely, that he is, in fact, the fugitive, who was arrested in Puerto Rico on February 25, 2022, and is the same person who is wanted in Canada. Moreover, the person who has appeared before this Court throughout these proceedings strongly resembles the person in the photographs of the fugitive provided by the government of Canada, which Witnesses 1, 2, and 3 of the Government of Canada each identified as depicting

D'Monte.[3] (*See* Murphy Affidavit, Docket No. 71-1.) The Court thus finds that there is probable cause to believe that the person before this Court, namely, Conor Vincent D'Monte (aka Brian Black, aka Manuel Nico Ortega, aka Leonard Gordon Douglas, aka "Benzo"), who was arrested in this District, and the Conor D'Monte whose extradition is being sought by the Government of Canada, are one and the same person.

### E.     The extradition request establishes probable cause that D'Monte committed the charged offenses.

To certify D'Monte as extraditable, the Court must conclude that probable cause exists to believe that D'Monte committed the offenses charged by the government for which, in this case, Canada, seeks his extradition. *See e.g., Kin-Hong*, 110 F.3d at 120 ("An extradition hearing does *not* require a higher standard of evidence than a probable cause hearing."). Probable cause exists if there is evidence sufficient to show reasonable grounds to believe the accused guilty. *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.") (internal quotation marks and citations omitted). Moreover, the "required probable cause hearing entails *no* determination of the guilt or innocence of the relator, but only whether there is 'competent legal evidence which . . . would justify [the relator's] apprehension and commitment for trial if the crime had been committed in that state.'" *Koskotas v. Roche*, 931 F.2d 169, 177 (1st Cir. 1991).

Extradition requires a finding of "probable cause under federal law." *Bovio v. U.S.*, 989 F.2d 255, 258 (7th Cir. 1993) (citing *Eain v. Wilkes*, 641 F.2d 504, 507-58 (7th Cir. 1981) (emphasis added); *see also U.S. v. Wiebe*, 733 F.2d 549, 553 (8th Cir. 1984) ("The probable cause standard applicable in extradition proceedings is defined in accordance with federal law . . .."). As such, extradition proceedings have been

---

[3] The Government of Canada disclosed the names of the witnesses in the unredacted version of the extradition package as: Witness 1 - Ryan Murphy, Witness 2 - David Murphy, and Witness 3 - Kreshnik Ismailaj.

compared to preliminary hearings in the federal system. *See Matter of Extradition of Taylor*, 484 F. Supp. 3d 13, 16-17 (D. Mass. Sep. 4, 2020) ("A magistrate judge applies the same standard of probable cause in international extradition hearings as used in preliminary hearings, in federal criminal proceedings.") (citation omitted).[4]

The Supreme Court stated in *Benson v. McMahon*:

> [T]he proceeding before the [court] is *not* to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him.

127 U.S. 457, 463 (1888); *see also Collins v. Loisel*, 259 U.S. 309, 316 (1922) ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and *not* to determine whether the evidence is sufficient to justify a conviction."); *Fernández v. Phillips*, 268 U.S. 311,

---

[4] If there is any dispute as to whether the federal or the Puerto Rico definition of probable cause applies, such dispute is found to be immaterial because, as the government correctly points out, federal and Puerto Rico law define probable cause *consistently*.

Under federal law, the evidence is sufficient, and probable cause exists, if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused. *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975); *see also Haxhiaj v. Hackman*, 528 F.3d 282, 287 (4th Cir. 2008) ("Section 3184 requires the extradition court to conduct essentially the same preliminary inquiry typically required for issuance of a search warrant or an arrest warrant.").

Similarly, as D'Monte concedes, the purpose of a preliminary hearing (and finding of probable cause) under Puerto Rico law is "to deal with probabilities, both as to the commission of an offense as well as to the perpetrator of said offense . . . [T]here are two probabilities: that a specific offense has been committed and that a certain person has committed it." (Docket No. 60 at 4); *see also Pueblo v. Granda*, 113 P.R. Dec. 558 (1982) (noting that probable cause existed as to murder charge where defendant possessed firearm because the "evidence brought before the trial judge is of such degree that it led him to firmly believe that with all reasonable probability an offense was committed and that the defendant committed the same") (citing *Pueblo v. Figueroa Castro*, 102 D.P.R. 279, 284 (1974)); *Miguel Angel Raldiris, etc., et al., Demandantes Y Recurridos v. Levitt & Sons of Puerto Rico, Inc.*, 103 P.R. Dec. 778, 3 P.R. Offic. Trans. 1087, 1091 (1975) (stating that probable cause is "a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true") (citation omitted).

312 (1925) ("Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict."); *Barapind v. Enomoto*, 400 F.3d 744, 752 (9th Cir. 2005) (en banc); *United States v. Perilla Umbarila*, 562 F. Supp. 3d 729, 741 (C.D. Cal. 2022).

"The *primary source of evidence* for the probable cause determination is the *extradition request*, and *any evidence submitted* in it *is deemed truthful* for the purposes of this determination." *In re Extradition of Atta*, 706 F. Supp. 1032, 1050–51 (E.D.N.Y. 1989) citing *Collins*, 259 U.S. at 315-16). In other words, an extradition magistrate is *bound to view submissions of the requesting country as true. See e.g., In re Solis*, 402 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005) ("Because [the fugitive's] argument does not accept Mexico's evidence as true, it is contradictory rather than explanatory within the meaning of extradition law."); *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997) (stating that the court "must accept as true all of the statements and offers of proof by the demanding state,' even if they contain hearsay.") (quotation omitted). *See also In re Extradition of Nuñez-Garrido*, 829 F. Supp. 2d 1277, 1294 (S.D. Fla. 2011) (fugitive's claim that his shooting was accidental contradicted requesting country's autopsy report, and therefore, could not "be thought to merely 'explain' the Government's evidence"); *Desautels v. United States*, 782 F. Supp. 942, 944 n.2 (D. Vt. 1991); *Ahmad v. Wigen*, 726 F. Supp. 389, 399–400 (E.D.N.Y. 1989).

Credibility determinations are reserved for the foreign court. *See e.g., Santos v. Thomas*, 830 F.3d 1002-03 (9th Cir. 2016) (en banc) (defense evidence that poses a "conflict of credibility" is *inadmissible* contradictory evidence); *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993); *Matter of Extradition of Singh*, 124 F.R.D. 571, 573 (D. N.J. 1987). Similarly, evidence (or argument) regarding the credibility of the requesting country's witnesses must be disregarded. *See e.g., Bovio*, at 259 (rejecting evidence that major witness lied during the investigation because "issues of credibility are to be determined at trial").

In that same vein, extradition treaties do not require, or even anticipate, live witness testimony at the hearing because to do so "would defeat the whole object of the treaty." *Yordi v. Nolte*, 215 U.S. 227, 231 (1909); *see also Bingham v. Bradley*, 241 U.S. 511, 517 (1916). Thus, hearsay evidence is admissible at extradition hearings and may properly support a court's findings leading to a certification under section 3184. *See Collins*, 259 U.S. at 317; *Bingham*, 241 U.S. at 517 (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he had not had the opportunity to cross-examine those witnesses); *Hoxha v. Levi*, 465 F.3d 554, 562 (3d Cir. 2006); *Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008) ("[C]ourts have consistently concluded that hearsay is an acceptable basis for a probable cause determination in the extradition context. Unsworn statements can be sufficient to support a probable cause determination.") (citations omitted). Nothing more is required, and typically, nothing more is provided. *See e.g., Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993); *Zanazanian v. United States*, 729 F.2d 624, 626-27 (9th Cir. 1984) (unsworn written statements may properly form the basis for certification).

As a result, the finding in favor of extradition may rest upon written statements from a foreign prosecutor, judge, or officer summarizing the evidence. *Rice v. Ames*, 180 U.S. 371, 375–76 (1901); *Jean v. Mattos*, No. CIV. 13-5346 KSH, 2014 WL 885058, at *5 (D. N.J. Mar. 5, 2014) at *5 ("That some evidence is 'alluded to' rather than 'reproduced'"–for example, the police reports from which witness statements were presumably extracted are not in the record – does *not* diminish the validity of what is satisfactorily described."); accord *Glucksman v. Henkel*, 221 U.S. 508, 513–14 (1911); *In re Extradition of García*, 825 F. Supp. 2d 810, 830 (S.D. Tx 2011) ("[E]xtradition can be predicated entirely on the 'unsworn statements of absent witnesses.'") (quoting *Collins*, 259 U.S. at 317).

Finally, "[i]t is fundamental that the person whose extradition is sought is *not* entitled to a full trial at the magistrate's probable cause hearing . . . . That is the task of the . . . courts of the other country." *Ordinola v. Hackman*, 478 F.3d 588, 608 (4th Cir. 2007).

In the present case, the Court finds that the evidence offered by the Government of Canada constitutes competent evidence to justify D'Monte's committal for trial on felony charges, had the offenses he is accused of committing occurred in the United States. This finding rests upon the documents submitted by the Government of Canada in this matter, including: (1) the Affidavit of Law of Karima Andami, Crown Counsel, British Columbia Prosecution Service, which includes the pertinent Canadian statutes, encloses certified copies of the Canadian indictment and arrest warrant underlying the extradition request; and (2) the Affidavit of Fact of Detective Terrence Murphy, City of Richmond, British Columbia.

D'Monte takes issue with the government's position that he is extraditable back to Canada to face the murder and the conspiracy to commit murder charges with which he has been accused of, arguing unequivocally that he "rejects the facts and the charges included in the extradition package." D'Monte also contends that the government is asking the Court "to adopt procedures that violate the Due Process Clause of the Fifth Amendment [of the U.S. Constitution] and certain rights enshrined in the laws of the Commonwealth of Puerto Rico." *See* Docket No. 60 at 1. Despite D'Monte's absolute rejection of the facts and charges presented by the Government of Canada, he did not introduce any evidence of his own, nor did he offer any plausible legal argument to support his challenges. The government, meanwhile, argues that D'Monte, being a relator in an extradition proceeding, is attempting to claim more due process rights than that afforded by law, and trying to secure the same rights as would be afforded to a criminal defendant facing a U.S. criminal trial, which is contrary to extradition law.

In effect, D'Monte is unavailingly attempting to turn this extradition proceeding into a mini trial, which is contrary to the most basic principles of extradition law. It is well-settled that "extradition proceedings are *not* to be converted into a dress rehearsal trial." *Koskotas*, 931 F.2d at 175 (internal quotation marks and citations omitted). Furthermore, pursuant to the abovementioned principles of extradition, D'Monte's broad rejection of the entire case brought against him by the Government of Canada does not pass legal muster. A finding of extraditability may be, and typically is, based *entirely* on the *four corners of the authenticated documentary evidence and information the requesting government has provided. See e.g., Afanasjev v. Hurlburt*, 418 F.3d 1159, 1162-63, 1166 (11th Cir. 2005) (upholding probable cause determination based on unsworn 106-page bill of indictment prepared by a foreign investigator describing witness statements and other hearsay evidence); *Manta v. Chertoff*, 518 F.3d 1134, 1139-40, 1145-47 (9th Cir. 2008) (upholding probable cause determination based on investigation report written by prosecutor); *Bovio*, 989 F.2d at 259-61 (Swedish investigator's statement sufficient to establish probable cause);[5] *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th Cir. 1977); *Shapiro v. Ferrandina*, 478 F.2d 894, 902-03 (2d Cr. 1973); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-34 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), aff'd, 28 F.3d 115 (11th Cir. 1994).

---

[5] In *Bovio*, the relator contested his certification of extraditability and argued on appeal that:

> (1)  [the investigator's] statements do not indicate how he obtained the information on which the statements are based, whether witnesses were under oath, and whether there are any original notes or recordings of witness interviews; (2) all the evidence implicating Bovio is hearsay; (3) there is no physical evidence implicating Bovio; and (4) the major witness relied upon by the Swedish government, Perttunen, has admitted lying during the investigation, and there is otherwise no corroboration of her account. *Id*. at 259.

The Seventh Circuit rejected all of these arguments, noting that a fugitive has "no right to attack the credibility" of witnesses in an extradition hearing, as "issues of credibility are to be determined at trial," and that "hearsay testimony is often used in extradition hearings." *Id*. at 259-60.

By the same token, D'Monte's attempts to poke holes at the evidence included in the extradition package are ineffective and, at best, would constitute inadmissible contradictory material. The rule against admitting contradictory evidence is based on longstanding Supreme Court precedent. *See Collins v. Loisel*, 259 U.S. 309, 316 (1922); *Charlton*, 229 U.S. at 461; *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 344022, at *8 (S.D. Fla. May 28, 2015) ("[Fugitive] has consistently attempted to contradict the case brought against him in [the requesting country]. . . . This [he] *cannot* do."); *United States v. Fernández-Morris*, 99 F. Supp. 2d 1358, 1361 (S.D. Fla. 1999) ("[t]estimony that merely gives the opposite version of the facts does *not* destroy the probability of guilt" and thus is *inadmissible*.) In addition, other than the sufficiency of the evidence, all matters that a fugitive may raise as defenses to extradition *are to be considered by the Secretary of State*, *not* by the court. *See* 18 U.S.C. §§ 3184, 3186.[6]

Having reviewed the record and the evidence before this Court, and after hearing from the parties during the extradition hearing, the Court accepts as true the facts as they were presented by the Government of Canada, as the Court must. The Court therefore finds that the extradition request from the Government of Canada establishes probable cause to believe that D'Monte committed the crimes charged by said government.[7] The Court now summarizes the relevant facts which support a finding of probable cause.

---

[6] The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country. *See Escobedo v. U.S.*, 623 F.2d 1098, 1105 (5th Cir. 1980). This is consistent with the long-held understanding that deciding whether to surrender a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the executive's powers to conduct foreign affairs. *In re Kaine*, 55 U.S. 103, 110 (1852). Similarly, a fugitive's contention that the extradition request is politically motivated or that the requesting state's justice system is unfair should be addressed by the Secretary of State, not the court. *See Koskotas*, 931 F.2d at 173–74 (noting that requesting state's motives are for executive branch to consider); *Kin-Hong*, 110 F.3d at 110 ("It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed"); *see also Prasoprat*, 421 F.3d at 1016; *Blaxland v. Commonwealth Director*, 323 F.3d 1198, 1208 (9th Cir. 2003); *Singh*, 123 F.R.D. 127 at 130.

[7] Under either the federal or Puerto Rico formulation of probable cause, the Government of Canada's submissions in support of extradition are sufficient to establish probable cause because they

## 1. *Relevant Facts in Support of Probable Cause.*

### A.    <u>The charges.</u>

The United States Government seeks to extradite D'Monte to Canada pursuant to the Treaty between the United States and Canada (Docket No. 39-1) to face criminal charges of conspiracy to commit murder in violation of Section 465(1)(a) of the Criminal Code of Canada ("CCC"), and first-degree murder in violation of Section 235 of the CCC.

Pursuant to the Treaty, the Government of Canada requested the provisional arrest of D'Monte with a view towards extradition to stand trial on charges of conspiracy to commit murder, in violation of Section 465(1)(a) of the CCC, and first-degree murder, in violation of Section 235 of the CCC. On January 24, 2011, British Columbia Supreme Court Associate Chief Justice A.W. Mackenzie, at Vancouver, Canada, issued a warrant for D'Monte's arrest based largely on the facts summarized below.

### B.    <u>An overview of the investigation.</u>

In August 2006, the Combined Forces Special Enforcement Unit of British Columbia, Canada ("CFSEU"), began an investigation into the violent activities of a gang known as the United Nations Gang ("UN Gang"). (Docket No 71-1 at Bates Stamp No. (hereinafter "Bates No.") No. 61). Agents of the CFSEU had learned of a conspiracy by members and associates of the UN Gang to murder members of a rival gang known as the Red Scorpions ("RS Gang"). *Id.* Among the specific targets for murder were the three Bacon brothers, Jonathan, Jamie, and Jarrod (the "Bacon Brothers"), and their associates. *Id.* The Bacon Brothers were known as the dominant and most violent element of the RS Gang. *Id.*

---

lead a reasonable person to believe that D'Monte committed the offenses underlying the extradition request. *See Romeo*, 1987 WL 12547, at *1. To the extent that federal and Puerto Rico law may differ as to the scope of admissible evidence at a preliminary hearing, the Puerto Rico rules do not purport to govern, and do not govern, in international extradition proceedings. *See Air Line Pilots Ass'n v. Precision Valley Aviation, Inc.*, 26 F.3d 220, 225 n.5 (1st Cir. 1994) (finding no contradiction between local rules where one is "narrowly tailored and relates specifically to motions, and noting that, regardless, when two statutes are in seeming conflict, the more specific statute ordinarily controls) (citing Norman J. Singer, Sutherland Statutory Construction § 51.05 (5th ed. 1992)).

As the CFSEU investigation advanced, the conflict between the UN Gang and the RS Gang grew increasingly more violent and unrestrained and involved shootings and murders which put the public at great risk. *Id.* This increased tension between the gangs changed the overall gang landscape in the Canadian province of British Columbia. *Id.*

In 2008, the CFSEU investigation into the activities of the UN Gang transformed into a murder investigation conducted jointly by the CFSEU and the Integrated Homicide Investigation Team ("IHIT"), a specialized investigative unit comprised of officers of the Royal Canadian Mounted Police ("RCMP") and municipal police departments in the Lower Mainland of British Columbia. *Id.*

In May of 2008, the conflict between the two gangs escalated with D'Monte's appointment as the day-to-day leader of the UN Gang. *Id.* Approximately six months following D'Monte's appointment as the gang's leader, RS Gang member Kevin Leclair ("Leclair") was murdered in a highly public attack committed in broad daylight. *Id.* D'Monte was later charged for his involvement in that murder as well as his participation in the conspiracy to murder the Bacon Brothers. In early 2011, however, D'Monte fled Canada to elude arrest. *Id.* The pending extradition request seeks to extradite D'Monte to Canada so that he can face prosecution for both the murder of Leclair and for his participation in the conspiracy to murder the Bacon Brothers and their associates.

The murder investigation targeting D'Monte is said to include surveillance, crime scene DNA, photographic and video evidence, reports of expert police witnesses, statements of civilian witnesses, evidence recovered from the execution of search warrants on residences, vehicles, and communication devices, as well as the interception of communications pursuant to judicial authorizations and other physical evidence. *Id.* at Bates No. 61-62. Among the civilian witnesses who gave evidence against D'Monte are individuals recruited from within the ranks of the UN Gang. *Id.* at Bates No. 62.

C.    Background of the conspiracy to murder the Bacon
Brothers and their associates.

The UN Gang was first formed in the mid-1990s as a group of friends who sold drugs in Abbotsford, a municipality in the greater Vancouver area. *Id.* An individual by the name of Clay Roueche ("Roueche") was the founder, first leader and, until his arrest in May 2008, the day-to-day manager of the gang. *Id.* Eventually, the group of friends expanded and evolved into a structured criminal organization with its own culture, rituals, and values. *Id.*

Between the years 2006 and 2007, a conflict between members of the UN Gang and the Bacon Brothers began to develop as a rivalry over drug territory. *Id.* The rivalry increased in intensity after incidents of disrespectful conduct escalated into violence. *Id.* Indeed, the original ire of the UN Gang was directed only towards the Bacon Brothers, but it later expanded to include the entire RS Gang as the Bacon Brothers' power and influence within the RS Gang grew. *Id.* Over time, there were several attempts by the UN Gang to kill the Bacon Brothers, including two incidents where Jonathan Bacon and Jamie Bacon were both shot but ultimately survived. *Id.* After those failed attempts, the Bacon Brothers became more difficult to kill, so the reward money for murdering any one of the brothers was eventually increased to $150,000. Reward money was also offered to anyone who murdered certain associates of the Bacon Brothers, including Leclair. *Id.* Leclair himself had a $50,000 bounty over his head. *Id.*

In May 2008, Clay Roueche was arrested in the United States on charges of drug trafficking. *Id.* at Bates No. 63. Following his arrest, D'Monte was chosen as the new leader of the UN Gang. *Id.* Under D'Monte's leadership, the conspiracy to murder the Bacon Brothers took on new importance with better intelligence gathering and the creation of "hit teams" to specifically target the Bacon Brothers and their associates. *Id.* D'Monte purportedly provided weapons to the hit teams and paid rewards for attacks on, and murders of, other RS Gang members, including the murder of Leclair. *Id.* Indeed, Leclair was a particularly important target for D'Monte

because he used to be a member of the UN Gang and used to work under D'Monte, but later switched allegiance and joined the RS Gang. *Id.*

As the investigation into the conspiracy to murder the Bacon Brothers progressed, six members or associates of the UN Gang agreed to testify as cooperating witnesses. In his Affidavit of Fact, Detective Terrence Murphy ("Detective Murphy") summarized the testimony of three of those witnesses, namely, the twin brothers Ryan Murphy and David Murphy ("Murphy Brothers") and Kreshnik Ismailaj ("Ismailaj").

On January 22, 2016, Ryan Murphy and David Murphy were arrested for their alleged roles in the conspiracy to murder the Bacon Brothers and their associates, as well as their involvement in a UN Gang shooting which resulted in the murder of Jonathan Barber and the attempted murder of Vicky King, both innocent victims of mistaken identity. *Id.* Upon their respective releases from prison, the Murphy Brothers were approached by investigators and asked if they would consider becoming witnesses for the prosecution against other UN Gang members. The Murphy Brothers later contacted police to say they were interested in providing information pertaining to offenses committed by members of the UN Gang. *Id.*

Between April 17, 2016, and June 1, 2016, the Murphy Brothers provided statements detailing their knowledge of, and involvement in, areas of value to the prosecution of UN Gang members. On August 30, 2016, the Murphy Brothers both pleaded guilty to participating in the activities of a criminal organization. Their testimonies are summarized further below.

In July 2018, Ismailaj was arrested for his involvement in the conspiracy to murder the Bacon Brothers and their associates and for the murder of Leclair. *Id.* Following his arrest, Ismailaj confessed to his role in the murder of Leclair. In September 2019, Ismailaj pleaded guilty to one count of conspiracy to commit murder and agreed to become a cooperating witness. His testimony is also summarized further below. *Id.* at 64.

D.     Background of Leclair's murder.

Leclair was originally a member of the UN Gang who had been recruited by D'Monte himself. Leclair later switched to the RS Gang after the UN Gang refused to support him in a dispute over money. *Id.* After switching to the RS Gang, Leclair became a threat to the UN Gang and was referred to by other members of the gang as "Traitor." *Id.* Because of his intimate knowledge of the UN Gang's activities, Leclair became a high priority target for murder by members of the UN Gang. *Id.* Those UN Gang members who became witnesses for law enforcement said that the UN Gang offered a monetary reward for Leclair's murder. *Id.* Two of the UN Gang members who later turned into police witnesses were directly involved in Leclair's murder, namely, Ryan Murphy and Ismailaj. They described the vehicles driven to and from the murder scene, identified the other individuals involved in the attack, and narrated each person's actions and conduct at the murder scene, including, more specifically, D'Monte's overall involvement in the murder of Leclair. *Id.*

On the afternoon of February 6, 2009, Leclair, who had just left a restaurant, was attacked, and murdered while in his vehicle in the parking lot of a shopping mall in the Vancouver suburb of Langley. *Id.* Witnesses saw two males attack Leclair with firearms. One shooter had an AR-15 assault-style rifle, while the other shooter had a semi-automatic pistol. Both firearms were recovered at the scene. *Id.*

Witness testimony, which Detective Murphy affirmed was corroborated by the subsequent investigation, identified two vehicles, a dark minivan ("the Van") and a silver/grey Nissan Murano ("the Murano"), entering the parking lot before the shooting and fleeing the parking lot in tandem immediately after the shooting. *Id.*

On June 1, 2018, Cory Vallee ("Vallee"), the individual who purportedly had the AR-15 assault-style rifle, was convicted of Leclair's murder, as well as a conspiracy to murder the Bacon Brothers and their associates. *Id.* Investigators identified the second shooter in the Leclair murder as Jesse Adkins ("Adkins"). *Id.* After the murder, Adkins and Vallee fled to Mexico to avoid arrest, though Adkins was later killed while in Mexico.

In due course, investigators learned from the UN Gang cooperators exactly who was involved in Leclair's murder and that D'Monte had organized the efforts to locate and kill Leclair. *Id.*

> E.   Ryan Murphy's testimony implicating D'Monte in the conspiracy to murder the Bacon Brothers and their associates.

Ryan Murphy was interviewed by Canadian law enforcement and provided information pertaining to the conflict between the UN Gang and the RS Gang. He also provided facts regarding the conspiracy to murder the Bacon Brothers and their associates. His testimony was summarized by Detective Murphy as follows.

Ryan Murphy was a long-time, senior member of the UN Gang and a former associate of D'Monte. *Id.* at 65. Ryan Murphy listed D'Monte as one of a limited number of UN Gang associates with whom he communicated regularly. *Id.* The conflict with the Bacon Brothers predated Ryan Murphy's involvement with the UN Gang but the rivalry peaked on May 8, 2008, with the murder of UN Gang member Duane Meyer ("Meyer") by an associate of the Bacon Brothers. *Id.*

Immediately after Meyer's murder, Ryan Murphy was contacted by D'Monte who said "We gotta go out and look for these guys." *Id.* Ryan Murphy said that D'Monte picked him up that evening and proceeded to show him several locations where the Bacon Brothers were known to frequent. *Id.* D'Monte was armed with a firearm though he purportedly had no intention of attacking anyone that evening. *Id.*

Ryan Murphy said that D'Monte was determined to win the war against the RS Gang and even took charge of the intelligence gathering effort and the dispersal of information himself. *Id.* He also purportedly ran the hit teams who were hunting for the Bacon Brothers and their associates. *Id.* According to Ryan Murphy, when he asked D'Monte about the intelligence he had gathered, D'Monte responded by saying, "Oh I've got crews and feelers out everywhere." *Id.*

According to Ryan Murphy, the UN Gang had a list of names, addresses and the vehicle license plate numbers of the Bacon Brothers and their associates. *Id.* That information purportedly came from UN Gang members and their associates and was

compiled mainly by D'Monte who, along with Clay Roueche, prior to his arrest, distributed the information to other gang members. *Id.* Ryan Murphy said he received the information by email from both Roueche and D'Monte. *Id.*

The evening that D'Monte and Ryan Murphy were together following Meyer's murder, D'Monte sent the list of addresses to UN Gang members who were expected to monitor the Bacon Brothers' haunts and report back to D'Monte. *Id.* If any of the Bacon Brothers were seen, a hit team would be dispatched to carry out an attack. *Id.* at 65-66. Ryan Murphy was familiar with the role of the hit team because he had attended meetings wherein the concept of the hit teams was discussed. *Id.* at 66. In addition, Adkins worked for Ryan Murphy and David Murphy, and they were the ones who assigned Adkins to the hit team when Vallee needed a partner to carry out attacks. *Id.*

D'Monte regularly sent updated lists to other UN Gang members, including Ryan Murphy, as well as updates about UN Gang efforts to locate and murder the Bacon Brothers. *Id.* D'Monte, meanwhile, acted as the coordinator who ran all the hit teams and dispensed all the information by encrypted messages on a BlackBerry device to enable attacks on the Bacon Brothers and their associates. *Id.* Ryan Murphy said he too received this information from D'Monte. *Id.* Indeed, when the UN Gang held meetings, Ryan Murphy witnessed D'Monte giving updates, saying things like, "My team saw them. I've got guys out now. My guys are looking at them right now." *Id.*

Following Roeuche's arrest by the United States government in May 2008 on drug trafficking charges, Ryan Murphy said he attended a meeting of UN Gang members where D'Monte was chosen as the new leader of the UN Gang. *Id.* Ryan Murphy also attended meetings where the gang discussed organizing itself into smaller cells which were to operate separately from each other when actions impacted the entire gang. *Id.* This reorganization was purportedly done with D'Monte's permission. *Id.*

Ryan Murphy also said that D'Monte supplied the teams with weapons and paid the hit teams when they were successful in an attack on the Bacon Brothers or their associates. *Id.* Following Leclair's murder, D'Monte said his money was tied up and he asked Ryan Murphy and David Murphy to pay Vallee and Adkins' reward money for having committed the murder of Leclair. *Id.* D'Monte said he would pay the rest himself as soon as he was able. *Id.*

Ryan Murphy further stated that D'Monte himself was actively involved in the hunt for the Bacon Brothers. Indeed, on one occasion, Ryan Murphy was golfing with his brother and their father when they saw an individual who looked identical to Jonathan Bacon. *Id.* They immediately called D'Monte who showed up at the golf course armed with two pistols, one of which was equipped with a silencer. *Id.* D'Monte was ready to shoot the individual but then decided that it wasn't Jonathan Bacon, so the attack was aborted. *Id.*

F.   Ryan Murphy's testimony implicating D'Monte in the Murder of Leclair.

With respect to his involvement, and that of D'Monte, in the murder of Leclair, Ryan Murphy explained that Leclair had been recruited by D'Monte and another individual by the name of Jorge Barriero. *Id.* at 67. After a falling out with members of the UN Gang, though, Leclair jumped ship and joined the RS Gang. *Id.*

Ryan Murphy explained that on February 6, 2009, Ismailaj acted as the driver of the lookout vehicle, while Vallee and Adkins comprised the hit team who ultimately killed Leclair. *Id.* He also implicated his brother, David Murphy, but said he left the scene before the murder was committed. *Id.*

After locating Leclair driving his vehicle in Langley, Ryan Murphy, who, along with Vallee were passengers in the Murano driven by Ismailaj, communicated with D'Monte by BlackBerry Messenger to inform him that they had located Leclair and asked that a hit team be immediately dispatched. *Id.* D'Monte said he would try to find a hit team but later informed Ryan Murphy that none was immediately available. He, therefore, instructed Ryan Murphy and the others to proceed on their own. *Id.* Ryan Murphy, Ismailaj, and Vallee then jointly agreed to carry out the attack

themselves. *Id.* Ryan Murphy said that he was the one who communicated directly with D'Monte using Blackberry Messenger and that he then passed on the information to Ismailaj and Vallee. *Id.*

The improvised hit team made up of Ryan Murphy, Valle and Adkins then followed Leclair until he parked his car and went into a restaurant in Langley. *Id.* at 68. The trio then drove to the Van, which Vallee said had been parked quite a distance away, and Ryan Murphy drove the Van back to the parking lot outside the restaurant, with Vallee as the passenger. *Id.* Ismailaj followed them in the Murano. *Id.* Vallee then contacted Adkins who joined Vallee and Ryan Murphy in the Van. *Id.*

Ryan Murphy said he parked the Van in the lot near Leclair's vehicle but not in a location that enabled him to see Leclair's vehicle. *Id.* Ismailaj, on the other hand, parked the Murano within view of Leclair's vehicle. *Id.* When Leclair came out of the restaurant and entered his car, Ismailaj alerted Ryan Murphy, whereupon Vallee and Adkins exited the Van and carried out the attack right there in the parking lot. *Id.* Ryan Murphy said he heard but could not see the shots being fired and was told by Vallee and Adkins how the attack went down after they returned to the Van. *Id.* Ryan Murphy then drove the Van from the crime scene, followed by Ismailaj in the Murano. *Id.*

BlackBerry messages were sent to D'Monte by either Ryan Murphy or Vallee to let him and the other UN Gang members know about the attack. *Id.* D'Monte had been asking for updates by BlackBerry Messenger throughout the event. *Id.* The UN Gang members, including D'Monte, were said to be extremely happy with the outcome. *Id.* D'Monte was the only person with whom Ryan Murphy discussed the murder. *Id.*

D'Monte then asked Ryan Murphy and David Murphy by BlackBerry Messenger to pay Vallee and Adkins for the murder. *Id.* D'Monte said he would reimburse them. *Id.* The Murphy brothers then paid $20,000 to Vallee and Adkins. *Id.*

G.   David Murphy's testimony implicating D'Monte in the
     conspiracy to murder the Bacon Brothers and their
     associates.

Like his brother, former UN Gang member David Murphy was interviewed by law enforcement regarding the conflict that existed between the UN Gang and the RS Gang, as well as the conspiracy to murder the Bacon Brothers and the plot to kill Leclair. Detective Murphy summarized his testimony regarding the conspiracy to kill the Bacon Brothers as follows.

David Murphy was a long-time member of the UN Gang who assumed the leadership of the gang after D'Monte fled from Canada to elude arrest by law enforcement. *Id.* at 68-69.

Previously, following Roueche's arrest in May of 2008, UN Gang members, including David Murphy, held a meeting whereupon D'Monte was promoted to boss of the UN Gang. *Id.* at 69. D'Monte then pushed for the UN Gang to become more organized and more systematic in the conflict including having dedicated teams assigned to do nothing but search for the Bacon Brothers and attack them. *Id.* David Murphy worked with D'Monte on organizing the hit teams. *Id.* Adkins, who also worked for the Murphy Brothers, was one of the guys on the hit teams. *Id.*

David Murphy confirmed that Vallee and Adkins were engaged as permanent members of a hit men. *Id.* If one of the Bacon Brothers, or an important associate of theirs, was ever spotted by a UN Gang member, the hit team, made up of Vallee and Adkins, would immediately be dispatched to carry out an attack. *Id.* When David Murphy, D'Monte and other UN Gang members got together, D'Monte would refer to Vallee and Adkins as his "Dream Team" because they were willing to do anything. *Id.*

David Murphy explained that D'Monte provided personal information about the Bacon Brothers and their associates to other members of the UN Gang. *Id.* D'Monte kept David Murphy up to date on events so that he could help disseminate information about the Bacon Brothers such as license plates and makes and models

of their vehicles. *Id.* This list was originally organized by Roueche and later by D'Monte after Roueche's arrest. *Id.*

David Murphy explained that D'Monte took his role as boss very seriously and pushed the UN Gang members to contribute firearms, money for rewards, intel about rivals and a vehicle for Vallee and Adkins. *Id.* D'Monte is said to have had an extensive collection of firearms some of which he donated to the "war effort" against the RS Gang. David Murphy himself also contributed firearms to be used by the hit team. *Id.*

Sometime after Roueche's arrest in May of 2008, D'Monte and others, including David Murphy, held a meeting at the Manzo Restaurant in Richmond where it was decided that the UN Gang would instead attack the lower-level associates of the RS Gang because the Bacon Brothers themselves were always being surveilled by the police. *Id.* at 70.

David Murphy also said that sometimes, after D'Monte paid the rewards for having committed attacks against the RS Gang members, he (D'Monte) would keep for himself some of the money he collected from other UN Gang members. *Id.*

### H.    David Murphy's testimony implicating D'Monte in the murder of Leclair.

David Murphy provided the following information as to his and D'Monte's involvement in the murder of Leclair. He admitted that on February 6, 2009, the day of Leclair's murder, he, Vallee, and Adkins were in a suburb of Langley hunting for the residence of an RS Gang member. *Id.* He mentioned that it happened to be the same area where later that day, Ryan Murphy and Ismailaj would carry out the murder of Leclair. *Id.* He confirmed however that he had left the area before Leclair was actually murdered. *Id.* A short time later, he said he received a text from D'Monte saying Leclair "got it" at a restaurant in Langley. *Id.* Then, within a few days after the murder of Leclair, he heard from D'Monte and Adkins that D'Monte had paid Valle and Adkins for the murder of Leclair. *Id.*

I.   Ismailaj's testimony implicating D'Monte for the conspiracy to murder the Bacon Brothers and their associates.

Ismailaj was also interviewed by Canadian law enforcement and provided information pertaining to the conflict between the UN Gang and the RS Gang, the conspiracy to murder the Bacon Brothers, and the murder of Leclair. His testimony includes the following.

Ismailaj admitted to being a member of the UN Gang and a close associate of the Murphy Brothers. *Id.* Ismailaj corroborated the origins of the UN Gang and the rivalry with the RS Gang. *Id.* at 70-71. Ismailaj also corroborated the Murphy Brothers' statements regarding D'Monte's involvement in supplying the UN Gang members with lists of addresses and vehicles used by the Bacon Brothers and their associates and D'Monte's use of Blackberry Messenger in order to keep his communications encrypted. *Id.* at 71. He also confirmed his attendance at a meeting of the UN Gang during which D'Monte was promoted to leader of the gang after Roueche's arrest in May 2008. *Id.* Indeed, Ismailaj compared D'Monte's position to that of a military chief with the power to decide who gets murdered. *Id.*

J.   Ismailaj's testimony implicating D'Monte for the murder of Leclair.

Ismailaj corroborated overall the testimony of the Murphy Brothers as to the origins of the feud between D'Monte and Leclair and the motivation behind his killing. *Id.* He further detailed the events of February 6, 2009, including his involvement and that of the Murphy Brothers, Vallee, and Adkins in Leclair's murder. *Id.* He further corroborated that after Ryan Murphy notified D'Monte by BlackBerry Messenger that they had located Leclair, Ryan Murphy had told him that D'Monte said that no hit team was available, and that the attack had to take place that day. *Id.* He also confirmed that D'Monte mentioned to Ryan Murphy something to the effect that, "I'm not there. I don't know how you guys are gonna do this, just get it done. This has to happen." *Id.* Whereupon Ryan Murphy and Ismailaj decided they would carry out the attack themselves. *Id.*

Ismailaj admitted to having acted as a lookout during the Leclair murder and that he was watching Leclair's vehicle waiting for him to return to it. *Id.* at 72. He said that he was the one who alerted Ryan Murphy, Vallee, and Adkins when Leclair returned to his vehicle. *Id.* Ismailaj said he saw Vallee and Adkins approach Leclair's vehicle with their firearms but did not see the attack because there were parked vehicles in the way. *Id.* He said he heard the gunshots and followed the Van driven by Ryan Murphy, with Vallee and Adkins as passengers, out of the parking lot. *Id.*

David Murphy confirmed that money was paid for the murder of Leclair but that neither Ismailaj nor Ryan Murphy wanted it. *Id.* All the money, he said, went to Adkins and Vallee. *Id.* The money, which was made up of bundles of cash in a bag, was brought to Ismailaj's house by David Murphy within a couple days of the murder of Leclair. *Id.* David Murphy told Ismailaj that D'Monte had contributed some of the reward money. *Id.*

K.     Identification of D'Monte.

Each of the three cooperating witnesses were shown the same arrest photograph of D'Monte during their interview. Each is said to have identified D'Monte by name from the photograph. *Id.*

L.     D'Monte is charged and flees Canada.

In January 2011, investigators were preparing for the arrest of D'Monte and the execution of search warrants at his residence pending the filing of charges by Crown Counsel. *Id.* On January 20, 2011, D'Monte, along with his wife and children, landed at the Vancouver International Airport. *Id.* D'Monte and his family travelled by limousine from the Vancouver International Airport to their home. *Id.* The last sighting of D'Monte by police in Canada was of him boarding the limousine with his family. *Id.*

The search warrant, issued by Justice of the Peace L. Ceklaj on January 22, 2011, was carried out on D'Monte's residence on January 23, 2011. *Id.* at 73. D'Monte, whom investigators intended to arrest for the murder of Leclair and the conspiracy

to commit the murders of the Bacon Brothers and their associates, was not in the residence and his location remained unknown to investigators until his arrest in Puerto Rico on February 25, 2022. *Id.*

On January 24, 2011, D'Monte was charged in Canada with, a) a conspiracy to commit the murders of Jonathan Bacon, Jamie Bacon, Jarrod Bacon, and their associates, and b) the first-degree murder of Leclair.

M.   D'Monte's Citizenship.

D'Monte is a citizen of both Canada and Ireland, but because both his Canadian and Irish passports expired in 2014, he does not currently possess a valid travel document from either country. A copy of both expired passports was introduced into evidence by the government during the extradition proceedings.

In conclusion, the evidence presented with the extradition package, including, Detective Murphy's Affidavit of Fact, describes and summarizes the evidence against D'Monte in support of the charged offenses, including statements from three cooperating witnesses, which are further corroborated by other materials amassed during the criminal investigation, and which included surveillance, crime scene DNA, and other physical evidence. Additional evidence collected during the investigation included video and photographs, reports of expert police witnesses, statements of civilian witnesses, the execution of judicial authorizations, including search warrants on residences, vehicles, and communication devices, and intercepted communications.

With respect to the charge of conspiracy to murder the Bacon Brothers and their associates, the evidence reflects that D'Monte orchestrated a concerted effort, and was actively involved in, obtaining information about the Bacon Brothers and their associates, which he shared with his subordinates and fellow gang members. He directed members of the UN Gang to look for the Bacon Brothers and their associates for the express purpose of murdering them. He encouraged and compensated them for this work and UN Gang members followed his directions.

With respect to the charge for the murder of Leclair, the evidence reflects that D'Monte viewed Leclair as a traitor who should be killed. D'Monte directed UN Gang members to murder Leclair. The murder occurred with D'Monte's knowledge, direction, and authorization. And ultimately, D'Monte paid the shooters for murdering Leclair.

The above recitation of facts constitutes competent and classic evidence "sufficient to sustain the charge" in the extradition context. The Court thus finds that "an independent assessment of the facts surrounding [the] offenses" supports a finding of probable cause. *Haxhiaj*, 528 F.3d at 290. *See United States v. Perilla Umbarila*, 562 F. Supp. 3d 729, 743 (C.D. Cal. 2022).

In sum, the Government of Canada's extradition request contains sufficient evidence of probable cause on each of the criminal charges for which the Government of Canada seeks D'Monte's extradition.

## IV.   <u>Conclusion</u>

The Court finds that all of the requirements for certification of extradition have been satisfied in this case.

**THEREFORE**, pursuant to 18 U.S.C. § 3184, the above findings, and legal conclusions, the Court hereby **CERTIFIES** the extradition of Conor Vincent D'Monte (aka Brian Black, aka Manuel Nico Ortega, aka Leonard Gordon Douglas, aka "Benzo") to the Secretary of State and commits him to custody to stand trial on all offenses for which extradition was requested.

**IT IS FURTHER ORDERED** that Conor Vincent D'Monte (aka Brian Black, aka Manuel Nico Ortega, aka Leonard Gordon Douglas, aka "Benzo") remain committed to the custody of the United States Marshal pending final decision on extradition and surrender by the Secretary of State pursuant to 18 U.S.C. §§ 3184, 3186.

**IT IS FURTHER ORDERED** that the Clerk of the Court deliver forthwith a certified copy of this Order on Extradition and Certificate of Extraditability, as well as a copy of the evidence presented in this case, including the formal extradition documents received in evidence and any testimony received in this case to the Secretary of State, for appropriate disposition.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this <u>9th</u> day of November 2023.

_s/ Marshal D. Morgan_
MARSHAL D. MORGAN
United States Magistrate Judge
